## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| | ) |
| **v.** | )  **Criminal No. 05-33 Erie** |
| | ) |
| **JOHN DOUGLAS GRAPE** | ) |

## **OPINION and ORDER**

This matter comes before the Court for consideration of the request of the United States

Medical Center for Federal Prisoners to involuntarily medicate the defendant to restore him to

competency in order to stand trial. The Court conducted a hearing on June 26, 2007, in Erie,

Pennsylvania, pursuant to Sell v. United States, 539 U.S. 166, 123 S.Ct. 2174 (2003), to

determine whether the Court may allow involuntary medication of the defendant. For the reasons

stated below we will permit the government to involuntarily medicate the defendant to restore his

competency.

## **I. Background**

On July 12, 2005, a federal grand jury in Erie, Pennsylvania returned a two count

indictment charging Mr. Grape with one count of receipt of material depicting the sexual

exploitation of a minor in violation of 18 U.S.C. § 2252(a)(2), and one count of possession of

material depicting the sexual exploitation of a minor in violation of 18 U.S.C. § 2252(a)(4)(B).

On September 2, 2005, Mr. Grape's defense counsel, Assistant Federal Public Defender Thomas

Patton, filed a motion for a competency hearing for an evaluation to determine if Mr. Grape is

competent to stand trial. Because Mr. Grape's counsel also filed a notice of insanity defense, on

September 13, 2005, the government filed a motion for an evaluation to determine if the Defendant was insane at the time of the offense. We granted both motions in September 2005, and ordered Mr. Grape into the custody of the Attorney General to be transported to a suitable facility for appropriate psychiatric or psychological examinations addressing Mr. Grape's competency and his criminal responsibility at the time of the crimes.

After some delay in finding an available facility, Mr. Grape was eventually admitted for evaluation at the Metropolitan Correctional Center in New York, New York on November 2, 2005. On January 4, 2006, two separate reports were issued: one to address criminal responsibility, and the other to address competency to stand trial. These reports are virtually identical, differing only with respect to the focus of the opinion. Because our present concern is Mr. Grape's competency to stand trial, we focus only on that report. The reports were prepared by Mr. Grape's primary evaluator, forensic psychologist Cristina Liberati, Ph.D. Dr. Liberati stated in her recommendations that Mr. Grape presented with "Pedophilia, Alcohol Abuse, Personality Disorder, Not Otherwise Specified, and Rule out Bipolar Disorder with Psychotic Features, Rule Out Malingering." (Competency To Stand Trail Evaluation, January 4, 2006, at 10.) She also stated, "Mr. Grape is hostile and uncooperative, and has refused to answer questions regarding his history and mental health, . . . ." (*Id.*) Dr. Liberati opined that Mr. Grapes's "refusal to cooperate is most likely a combination of his mental illness and manipulativeness." (*Id.*) Because of Mr. Grape's refusal to cooperate with Dr. Liberati, she was limited to other sources in discovering Mr. Grapes's relevant history. Her review of his psychological records revealed that such records "have been inconsistent stating that Mr. Grape has a history of suffering from psychosis while others report a history of malingering and

2

personality disorders." (*Id.* at 11.) Dr. Liberati repeatedly stated in one form or another that "it is unclear whether his lack of cooperation is currently due to a mental disease or a deliberate unwillingness to cooperate." (*Id.* at 12.)

Dr. Liberati was unable to offer an opinion on either criminal responsibility or competency because Mr. Grape did not cooperate. With regard to the competency issue she stated that "[i]n order to determine an accurate diagnosis and make a reasonable decision regarding how his mental status would affect the legal proceedings, Mr. Grape would need to consent to an evaluation." (*Id.* at 11.)

On February 6, 2006, the Court granted defense counsel's second motion for a psychological evaluation. Following another delay in assigning Mr. Grape to a suitable facility, and the Court's entry of an Order to expedite the evaluation, Mr. Grape was admitted for an evaluation at the Metropolitan Correctional Center in Chicago, Illinois, on April 5, 2006. A report dated June 23, 2006, again indicated that the evaluator was unable to provide an opinion as to competency or sanity due to Mr. Grape's uncooperative behavior and manipulation of the assessment process. The report was prepared by Mr. Grape's primary evaluator, forensic psychologist Jason V. Dana, Psy.D.

After reviewing Mr. Grape's oppositional behavior and uncooperativeness in the past and at MCC New York, Dr. Dana noted that Mr. Grape's stay at MCC Chicago "was rather consistent with that described at MCC New York." (Forensic Report, June 23, 2006, at 4.) Dr. Dana gave Mr. Grape diagnoses of Pedophilia, non-Exclusive Type, Alcohol Dependence, Malingering, Rule out Psychotic Disorder not Otherwise Specified (NOS) and Antisocial

3

Personality Disorder with Narcissistic Traits. With regard to Mr. Grape's malingering, Dr. Dana
stated that:

> It is important to note that malingering does not necessarily indicate the absence
> of any other form of mental health concern. However, the intentional
> misrepresentation of symptomatology and the provision of invalid information
> renders comprehensive assessment of true psychological state difficult.

(*Id.* at 10.) Thus, Dr. Dana could not rule out that Mr. Grape did have a psychotic disorder. He
explained that a "diagnosis of psychotic disorder NOS is offered because the defendant's
malingered response style made it extremely difficult to determine if an underlying psychotic
disorder may account for a portion of his unusual behaviors and report of delusional thinking in
the past." (*Id.*) Given Mr. Grape's uncooperativeness with the past two assessments, Dr. Dana
opined that the Court should either proceed with legal proceedings or remand the defendant for a
period of restoration of competency treatment under section 4241(d). Ultimately, Dr. Dana
stated that "the most prudent course of action in this case is to remand the defendant for
restoration treatment and study at a psychiatric medical center." (*Id.* at 11.) Dr. Dana explained
that a "period of treatment in a psychiatric hospital would afford evaluators and clinicians the
opportunity to monitor the defendant over a lengthier period of time, address the many behavior
management issues presented by Mr. Grape, and more firmly establish the diagnosis of
malingering." (*Id.*)

Based on the June 23, 2006 Report the Court held a competency hearing on July 20,
2006, after which we found that Mr. Grape was "suffering from a mental disease or defect
rendering him mentally incompetent to the extent that he is unable to understand the nature and
consequences of the proceedings against him or to assist properly in his defense," and he was

4

remanded, pursuant to section 4121(d), to a suitable medical facility "to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the trial to proceed." (Order, July 20, 2006, Doc. 52.) Mr. Grape was then received for psychological evaluation and treatment at the United States Medical Center for Federal Prisoners in Springfield, Missouri, on September 7, 2006.

By letter dated December 15, 2006, Attorney Joseph McGuire from the Medical Center for Federal Prisoners in Springfield reported to the Court that Mr. Grape was refusing recommended medical treatment. He stated that evaluations conducted by staff psychologist Christina A. Pietz, Ph.D. and psychiatrist James Wolfson, M.D. indicate that Mr. Grape requires treatment with antipsychotic medication in order to restore him to competency to stand trial. Included with the letter was a copy of a Medical Treatment Refusal form completed by Mr. Grape on November 27, 2006, indicating that he refuses treatment with antipsychotic medication. Mr. McGuire further informed the Court that Mr. Grape was not a currently a danger to himself or others in the context of his confinement, the medical staff believed that a hearing was necessary to determine whether antipsychotic medication can be involuntarily administered to Mr. Grape pursuant to *Sell v. United States*, 539 U.S. 166 (2003). Mr. McGuire concluded his letter with a request that the court permit any hearings to be conducted by video-teleconferencing in order to maintain a stable treatment environment for Mr. Grape.

As a result of the information provided by Mr. McGuire, the Court met with counsel on January 23, 2007, in Erie, Pennsylvania, and determined that it was necessary to have a hearing pursuant to *Sell v. United States*, 539 U.S. 166 (2003). The hearing was initially set for March 28 2006, but was continued upon motion of the Defendant to June 26, 2007. In conjunction with the

5

hearing, we also ordered the medical staff at the Medical Center to provide the Court, defense
counsel, and the prosecution, with an appropriate forensic report setting forth Mr. Grape's
diagnosis, the specific type and dosage of medication sought to be administered, any potential
side effects of that medication, why they believe use of this medication is medically appropriate,
and why less intrusive alternatives are not available.

In accordance with our Order a Forensic Report dated February 16, 2007, was prepared
by Dr. Pietz and Robert G. Sarrazin, M.D., who had assumed the position of Chief of Psychiatry
at the Springfield Medical Center, succeeding Dr. Wolfson. Doctors Pietz and Sarrazin reported
that Mr. Grape suffers from paranoid schizophrenia, a mental disease, and antisocial personality
disorder, and thus he is presently not competent to stand trial. (Forensic Report, February 16,
2007, at 1.) In their, opinion, the "administration of medications is substantially likely to restore
Mr. Grape competent to stand trial." (*Id.*)

In support of this conclusion, the doctors provided the following general statistics from
the Bureau of Prisons study of section 4241(d) cases for the last twelve months:

The data shows that 285 patients were committed to the bureau of Prisons for
restoration of competency pursuant to 18 USC 4241(d) during this time period.
Of those 285 committed, 43 were not restored to competency. This included an
unknown number of patients who suffered from conditions such as dementia and
mental retardation of such a severity that they would not be restored to
competency regardless of the administration of medication. In addition, 59 of the
285 were involuntarily medicated at least once following an administrative Due
Process hearing. Of those that required involuntary medication, 14, or 23.7%
were not restored to competency.

(*Id.*) With regard to Mr. Grape specifically, the doctors explained that "antipsychotic
medications can be very effective in treatment of his paranoid schizophrenia." (*Id.*)
Furthermore, they stated that "[a]ntipsychotic medications are the treatment of choice for

6

psychotic disorders and are substantially likely to at least lessen the symptomatology of the delusions ... [and that] the Bureau has approximately a 70% success rate in restoring involuntarily medicated defendants to competency." (*Id.*)

Doctors Pietz and Sarrazin then explain that the preferable choice of antipsychotic medications is a class of medications known as the "second generation" medications, which include olanzipine, risperidone, ziprasidone, quetiapine, and aripiprazole. (*Id.*) In the event that the second generation medications were not helpful to Mr. Grape, or if an injectable medication is necessary, the doctors would then consider using the "first generation" medications, which include haldol, prolixin, or navane. (*Id.*)

The second generation medications are much less likely than first generation medications to cause neuroleptic malignant syndrome, tardive dyskinesia, or extrapyramidal side effects such as stiffness, and feelings of anxiety or agitation. (*Id.* at 1-2.) Second generation medications are associated with elevated blood glucose and lipids, but the medical staff at Springfield has a monitoring system in place to detect any such elevations. (*Id.* at 2.) Common side effects of second generation medications include weight gain, sedation, and orthostatic hypotension, but such common side effects are usually not severe and are short-lived. (*Id.*) If necessary, a different medication can be tried if the side effects of one medication indicate that a change is warranted. (*Id.*) The doctors also state "that it is unlikely that any side effects of antipsychotic medications experienced by Mr. Grape would significantly interfere with Mr. Grape's ability to assist counsel in conducting his defense." (*Id.*)

The doctors' opinion is that administration of antipsychotic medication to Mr. Grape is medically appropriate, is in his best medical interest, and that it is unlikely that there is any less

7

intrusive alternative available. (*Id.*) The doctors also note that Mr. Grape's refusal to consent to treatment most likely "stems from deficits induced by the illness itself . . . ." (*Id.*)

Finally, the doctors suggest that Mr. Grape would be medicated with the second generation antipsychotic risperdone, a medication that Mr. Grape has previously taken, beginning at 1 mg per day, with the dosage eventually being raised to between 4 to 6 mg per day. (*Id.*, at 2-3.) The second generation antipsychotic aripiprazole is another possible medication to be administered with a dosage starting at 15 mg per day and being raised to between 30 to 45 mg per day. (*Id.*, at 3.) In the event that Mr. Grape does not cooperate with the administration of these second generation medications, then the use of an injectable first generation medication, such as haloperidol, would be necessary. (*Id.*)

As noted, Mr. Grape's doctors initially suggested to the Court that a *Sell* hearing was necessary because alternative grounds did not exist for forced medication as Mr. Grape "is not currently a danger to himself or others in the context of his confinement in a federal prison hospital, . . . ." (Letter from McGuire to the Court, December 15, 2006.) On May 15, 2007, a formal hearing, otherwise known as a *Harper* hearing, was conducted at the Springfield Medical Center by Psychiatrist Carlos Tomelleri, M.D., to address whether involuntary medication was warranted based on Mr. Grape's being a danger to himself or others and that the treatment is in his best medical interest. (Involuntary Medication Report, Gov. Ex. 2, *see Washington v. Harper*, 494 U.S. 210, 110 S.Ct. 1028 (1990).)

A staff psychologist, R. DeMier, Ph.D., was appointed as Mr. Grape's representative. Dr. DeMier stated on behalf of Mr. Grape, that Mr. Grape was able to clearly articulate to Dr. DeMier that he objected to treatment by medication. (Involuntary Medication Report, at 3.)

8

Mr. Grape himself also clearly articulated at the hearing that he does not believe he is mentally ill or is in need of treatment with psychotropic medication. (*Id.*)

Dr. Tomelleri recounted Mr. Grape's history and summarized his appearance at the hearing before concluding that "Mr. Grape is severely mentally ill and exhibits prominent thought disturbance, marked impairment of judgment, and his verbal threats are an indication of potential danger to others." (*Id.*, at 5.) Dr. Tomelleri further stated as follows:

Psychotropic medication is the treatment of choice for Mr. Grape's condition. Other, less intrusive treatment modalities such as psychotherapy would be totally ineffective since it does not address the fundamental problem. Minor tranquilizers can be helpful in reducing agitation but would not affect the core manifestations of Mr. Grape's mental disorder.

(*Id.*) However, Dr. Tomelleri also found that Mr. Grape's "inappropriate, belligerent and threatening behavior can be adequately managed by purely correctional measures, pending the Court's decision regarding involuntary treatment with psychotropic medication to attempt to restore Mr. Grape to competency." (*Id.*) Therefore, Dr. Tomelleri concluded that involuntary medication is not approved on grounds that Mr. Grape is danger to himself or others. (*Id.*, at 5.)

At the *Sell* hearing on June 26, 2007, both Dr. Pietz and Dr. Sarrazin testified via video conference from the Medical Center in Springfield, expanding on their February 16, 2007 Forensic Report. Mr. Grape also appeared via video conference, joining doctors Pietz and Sarrazin as they testified. Mr. Grape's attorney, Assistant Federal Public Defender Thomas Patton, and the attorney for the government, Assistant United States Attorney Christian Trabold, appeared in person in Erie, Pennsylvania.

9

## II. Applicable Law

The narrow issue presented in this case is whether Mr. Grape should be involuntarily medicated "in order to render [him] competent to stand trial;" that is, a court may only order involuntary medication "solely for trial competence purposes in certain instances." *Sell*, 539 U.S. at 179& 180, 123 S.Ct. at 2184.

Our starting point is the defendant's constitutionally protected Fifth and Fourteenth Amendment liberty interest in remaining free from unwanted medical treatment. The United States Supreme Court has recognized that an individual has a constitutionally protected liberty interest in avoiding the unwanted administration of antipsychotic drugs that can only be overcome by an 'essential' or 'overriding' state interest. *Riggins v. Nevada*, 504 U.S. 127, 134, 135, 112 S. Ct. 1810 (1992), *Washington v. Harper*, 494 U.S. 210, 221, 110 S.Ct. 1028 (1990).

There are four factors a court must find before determining that involuntary medication to restore competency is warranted: (1) that important governmental interests are at stake; (2) that involuntary medication will significantly further the important governmental interests; that is, the court must find that involuntary medication is substantially likely to render the defendant competent to stand trial; (3) that involuntary medication is necessary to further the important governmental interests; that is, the court must find that any alternative, less intrusive treatments are unlikely to achieve substantially the same results; and (4) administration of the drugs is medically appropriate; that is, that the treatment is in the patient's best medical interest in light of his medical condition. *Sell*, 539 U.S. at 180-181, 123 S.Ct. at 2184-2185.

Before turning to the above factors, however, the *Sell* Court instructs that the first item for a court to examine is whether "forced medication is warranted for a *different* purpose." *Sell*,

10

539 U.S. at 182, 123 S.Ct. at 2185 (emphasis in original). The Supreme Court stated this

precondition as follows:

> We emphasize that the court applying these standards is seeking to
> determine whether involuntary administration of drugs is necessary significantly
> to further a particular governmental interest, namely, the interest in rendering the
> defendant competent to stand trial. A court need not consider whether to allow
> forced medication for that kind of purpose, if forced medication is warranted for a
> *different* purpose, such as the purposes set out in *Harper* related to the individual's
> dangerousness, or purposes related to the individual's own interests where refusal
> to take drugs puts his health gravely at risk. 494 U.S., at 225-226, 108 L Ed 2d
> 178, 110 S Ct 1028.

*Sell*, 539 U.S. at 181-182, 123 S.Ct. at 2185.

In *Harper* the Supreme Court held that "'the Due Process Clause permits the State to treat

a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the

inmate is dangerous to himself or others and the treatment is in the inmate's medical interest.'"

*Sell*, 539 U.S. at 178, 123 S.Ct. at 2182, quoting *Washington v. Harper*, 494 U.S. 210, 227, 110

S.Ct. 1028 (1990).

Similarly, the Supreme Court in *Riggins* "citing *Harper*, noted that the State 'would have

satisfied due process if the prosecution had demonstrated . . . that treatment with antipsychotic

medication was medically appropriate and, considering less intrusive alternatives, essential for

the sake of Riggins' *own safety or the safety of others*.'" *Sell*, 539 U.S. at 179, 123 S.Ct. at 2183

(emphasis added in *Sell*), quoting *Riggins v. Nevada*, 504 U.S. 127, 135, 112 S. Ct. 1810 (1992).

In *Riggins*, the Court also suggested that involuntary medication might have been justified if the

State had established "'that it could not obtain an adjudication of Riggins' guilt or innocence' of

the murder charge 'by using less intrusive means.'" *Sell*, 539 U.S. at 179, 123 S.Ct. at 2184,

quoting *Riggins*, 504 U.S. at 135.

11

In light of the *Harper* and *Riggins* cases, the Supreme Court in *Sell* stated:

> These two cases, *Harper* and *Riggins*, indicate that the Constitution permits the Government involuntarily to administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial, but only if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial, and, taking account of less intrusive alternatives, is necessary significantly to further important governmental trial-related interests.
>
> This standard will permit involuntary administration of drugs solely for trial competence purposes in certain instances. But those instances may be rare.

*Sell*, 539 U.S. at 179-180, 123 S.Ct. at 2184.

Regarding the preliminary consideration of whether involuntary medication can be authorized on other grounds, the Supreme Court explained in some detail why they believe this is the best approach. In *Sell*, the Supreme Court stated that "[t]here are often strong reasons for a court to determine whether forced administration of drugs can be justified on . . . alternative grounds before turning to the trial competence question." *Sell*, 539 U.S. at 182, 123 S.Ct. at 2185.

The Court first explained that "the inquiry into whether medication is permissible, say, to render an individual nondangerous is usually more 'objective and manageable' than the inquiry into whether medication is permissible to render a defendant competent." *Id.*, quoting *Riggins*, 504 U.S. at 140, 112 S Ct 1810 (Kennedy, J., concurring in judgment). They also opined that the "medical experts may find it easier to provide an informed opinion about whether, given the risk of side effects, particular drugs are medically appropriate and necessary to control a patient's potentially dangerous behavior (or to avoid serious harm to the patient himself) than to try to balance harms and benefits related to the more quintessentially legal questions of trial fairness and competence." *Sell*, 539 U.S. at 182, 123 S.Ct. at 2185.

12

The Supreme Court in *Sell* also explained that "courts typically address involuntary medical treatment as a civil matter, and justify it on these alternative, *Harper*-type grounds." *Sell*, 539 U.S. at 182, 123 S.Ct. at 2185. The Court noted that "[e]very State provides avenues through which, for example, a doctor or institution can seek appointment of a guardian with the power to make a decision authorizing medication -- when in the best interests of a patient who lacks the mental competence to make such a decision." *Id.* (citation omitted). And courts, in civil proceedings, may authorize involuntary medication where the patient's failure to accept treatment threatens injury to the patient or others. *Id.* (citations omitted).

The Supreme Court stated its position that even if alternative grounds are not found, by first conducting an inquiry into alternative grounds for forced medication, a court will go a long way towards answering the question of whether forced medication is authorized under the *Sell* factors, stating:

> Even if a court decides medication cannot be authorized on the alternative grounds, the findings underlying such a decision will help to inform expert opinion and judicial decisionmaking in respect to a request to administer drugs for trial competence purposes.

*Sell*, 539 U.S. at 183, 123 S.Ct. at 2186. The Court continued, explaining that this inquiry will "facilitate direct medical and legal focus" upon the following questions: "Why is it medically appropriate forcibly to administer antipsychotic drugs to an individual who (1) is *not* dangerous *and* (2) *is* competent to make up his own mind about treatment? Can bringing such an individual to trial *alone* justify in whole (or at least in significant part) administration of a drug that may have adverse side effects, including side effects that may to some extent impair a defense at trial?" *Sell*, 539 U.S. at 183, 123 S.Ct. at 2186 (emphasis in original).

13

Assuming that forced medication on other grounds is not warranted, a court must then

consider whether the government has established that the above-mentioned four factors have

been met. *Sell*, 539 U.S. at 183, 123 S.Ct. at 2186. The Supreme Court elaborated on the four

factors we are to consider as follows:

> First, a court must find that important governmental interests are at stake. The Government's interest in bringing to trial an individual accused of a serious crime is important. That is so whether the offense is a serious crime against the person or a serious crime against property. In both instances the Government seeks to protect through application of the criminal law the basic human need for security. *See Riggins, supra*, 504 U.S. 127 at 135-136, 118 L Ed 2d 479, 112 S Ct 1810 ("'Power to bring an accused to trial is fundamental to a scheme of "ordered liberty" and prerequisite to social justice and peace'" (quoting *Illinois v. Allen*, 397 U.S. 337, 347, 25 L. Ed. 2d 353, 90 S. Ct. 1057 (1970) (Brennan, J., concurring))).

> Courts, however, must consider the facts of the individual case in evaluating the Government's interest in prosecution. Special circumstances may lessen the importance of that interest. The defendant's failure to take drugs voluntarily, for example, may mean lengthy confinement in an institution for the mentally ill--and that would diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime. We do not mean to suggest that civil commitment is a substitute for a criminal trial. The Government has a substantial interest in timely prosecution. And it may be difficult or impossible to try a defendant who regains competence after years of commitment during which memories may fade and evidence may be lost. The potential for future confinement affects, but does not totally undermine, the strength of the need for prosecution. The same is true of the possibility that the defendant has already been confined for a significant amount of time (for which he would receive credit toward any sentence ultimately imposed, see 18 U.S.C. § 3585(b) [18 USCS § 3585(b)]). Moreover, the Government has a concomitant, constitutionally essential interest in assuring that the defendant's trial is a fair one.

> Second, the court must conclude that involuntary medication will significantly further those concomitant state interests. It must find that administration of the drugs is substantially likely to render the defendant competent to stand trial. At the same time, it must find that administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair. *See Riggins, supra*, 504 U.S. at 142-145, 118 L Ed 2d 479, 112 S Ct 1810 (Kennedy, J., concurring in judgment).

14

Third, the court must conclude that involuntary medication is necessary to further those interests. The court must find that any alternative, less intrusive treatments are unlikely to achieve substantially the same results. *Cf. Brief for American Psychological Association as Amicus Curiae* 10-14 (nondrug therapies may be effective in restoring psychotic defendants to competence); *but cf. Brief for American Psychiatric Association et al. as Amici Curiae* 13-22 (alternative treatments for psychosis commonly not as effective as medication). And the court must consider less intrusive means for administering the drugs, *e.g.*, a court order to the defendant backed by the contempt power, before considering more intrusive methods.

Fourth, as we have said, the court must conclude that administration of the drugs is medically appropriate, *i.e.*, in the patient's best medical interest in light of his medical condition. The specific kinds of drugs at issue may matter here as elsewhere. Different kinds of antipsychotic drugs may produce different side effects and enjoy different levels of success.

*Sell*, 539 U.S. at 180-181, 123 S.Ct. at 2184-2185.

"The Supreme Court is silent on what standard applies in evaluating these factors, and the

Third Circuit has likewise not addressed the questions." *United States v. McCray*, 474 F.Supp.2d

671, 676-677 (D.N.J. 2007). "Given the importance of the Constitutional interest at issue, this

Court finds it appropriate to apply the clear and convincing standard." *Id.* at 677 (citing *United

States v. Gomez*, 387 F.3d 157, 160 (2d Cir. 2004), and *United States v. Bradley*, 417 F.3d 1107,

1114 (10th Cir. 2005).

## III. Discussion

The Supreme Court instructs that our initial inquiry should be "whether the Government

seeks, or has first sought, permission for forced administration of drugs on these other

*Harper*-type grounds; and, if not, why not." *Sell*, 539 U.S. at 183, 123 S.Ct. at 2186. Here, the

doctors involved in Mr. Grape's care suggested to the Court that a *Sell* hearing was necessary

because alternative grounds did not exist for forced medication as Mr. Grape "is not currently a

danger to himself or others in the context of his confinement in a federal prison hospital, . . . ."
(Letter from McGuire to the Court, December 15, 2006.) Thereafter, a *Harper* hearing was
conducted at the Springfield Medical Center on May 15, 2007, which concluded that involuntary
medication is not approved on grounds that Mr. Grape is a danger to himself or others. The
government clearly has sought permission to administer medication on other grounds and we find
that involuntary medication is not warranted for other purposes. Thus, we must consider the four
*Sell* factors in determining whether involuntary medication is warranted in order to render
Mr. Grape competent to stand trial.

## A. Important Governmental Interests

We have no trouble concluding that important governmental interests are at stake here.
The *Sell* case instructs that the "Government's interest in bringing to trial an individual accused
of a serious crime is important." *Sell*, 539 U.S. at 180, 123 S.Ct. at 2184. The instant offenses of
receipt and possession of material depicting the sexual exploitation of a minor are serious crimes.
For receipt of material depicting the sexual exploitation of a minor there is a statutory minimum
of 15 years imprisonment, while for possession of the same material there is a statutory minimum
of 10 years incarceration. Mr. Grape has prior convictions that conservatively would place him
in a criminal history category of III. A best case scenario for Mr. Grape would likely place him
in a guideline sentence range of 87 to 108 months' imprisonment, however he would still be
subject to the statutory minimum. Thus, it is clear that the offenses charged against Mr. Grape
are serious and that the government's interest in prosecuting him is important.

Our inquiry does not end however. The Supreme Court also instructs us to consider "the
facts of the individual case" because "[s]pecial circumstances may lessen the importance" of the

16

government's important interest." *Id.* The Supreme Court noted that the "defendant's failure to take drugs voluntarily, for example, may mean lengthy confinement in an institution for the mentally ill--and that would diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime." *Id.* Even so, the Supreme Court also explained that it did not mean to suggest that "civil commitment is a substitute for a criminal trial." *Id.* Other individualized circumstances noted by the Supreme Court are the fact that it "may be difficult or impossible to try a defendant who regains competence after years of commitment during which memories may fade and evidence may be lost." *Id.* The Court also noted that the "potential for future confinement affects, but does not totally undermine, the strength of the need for prosecution" and that the same is true of the "possibility that the defendant has already been confined for a significant amount of time (for which he would receive credit toward any sentence ultimately imposed)." *Id.*

Counsel for Mr. Grape argues that Mr. Grape's circumstances do lessen the importance of the government's interest in prosecuting this action. Specifically, he argues that the evidence and testimony from the hearing support the inevitable conclusion that Mr. Grape will be civilly committed if he is not involuntarily medicated or if he is not restored to competency.

If Mr. Grape's right not to be involuntarily medicated is upheld, and he is not able to be restored to competency, then he will be subject to section 4241(d) of Title 18 of the United States Code. Pursuant to section 4241(d), if "it is determined that [Mr. Grape's] mental condition has not so improved as to permit the trial to proceed, the defendant is subject to the provisions of section 4246." 18 U.S.C. § 4241(d). Section 4246 concerns the hospitalization of a person due

17

for release but who is still suffering from a mental disease or defect, and also applies to those defendants who have not been restored to competency as set forth in 4241(d).

For our present purposes, the significance of section 4246 is its provision for a hearing to determine "whether the person is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person . . . ." 18 U.S.C. § 4246(a). Defense counsel argues that based on the Involuntary Medication Report and Dr. Pietz' testimony from the hearing the only reason that the government cannot forcibly medicate Mr. Grape at this time is because he is not a danger to himself or others *while he is confined*. In other words, counsel argues that we know that it is substantially likely that the result of any section 4246 hearing will be a finding that Mr. Grape's release will create a substantial risk of injury to other persons. Consequently, he will not be released and he will not reenter society unmedicated. Therefore, counsel argues that if Mr. Grape is not restored to competency, either because he is not involuntarily medicated or because forced medication treatment fails, he will end up with a "lengthy confinement in an institution for the mentally ill," which "would diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime." *Sell*, 539 U.S. at 180, 123 S.Ct. at 2184.

Even though a section 4246 hearing has not been held, we note that there is no serious dispute that the likelihood of Mr. Grape reentering society unmedicated is extremely low. Indeed, there is no other reading of the Medical Center's *Harper* hearing conclusion other than, but for his confinement, Mr. Grape would be a danger. Thus, the likelihood of civil commitment here does diminish the government's interest in this case. Evaluating the first *Sell* factor alone, however, we find that the likelihood of civil confinement, although diminishing the

18

government's interest, does not overcome the government's substantial interest in prosecuting this case in light of the seriousness of the charges alleged against Mr. Grape. We thus find that the government has established the first *Sell* factor.

The government recognizes the likelihood that Mr. Grape will be civilly committed if he is not medicated, but notes that Mr. Grape has not been evaluated under the standards of civil commitment pursuant to section 4246, and that it is premature to leave Mr. Grape in his current condition without first attempting to restore his competency through medication. In response, defense counsel strenuously argues that based on the government's own evidence it is not substantially likely that medication treatment will restore Mr. Grape's competency. Defense counsel further argues that if medication is not substantially likely to restore Mr. Grape's competency, then forced medication will only delay the inevitable at the expense of Mr. Grape's constitutionally protected liberty interest in remaining free from unwanted medical treatment. This argument brings us to the central question in this case of whether medication is substantially likely to restore Mr. Grape's competency, which we consider under the second *Sell* factor.

## B. Will Involuntary Medication Further the Governmental Interests

Under the second factor we consider whether administration of the drugs is substantially likely to render Mr. Grape competent to stand trial. *Sell*, 539 U.S. at 180, 123 S.Ct. at 2184. "At the same time, [we] must find that administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." *Sell*, 539 U.S. at 181, 123 S.Ct. at 2184-2185.

19

As noted, both doctors testified that treatment with medication would be substantially likely to render Mr. Grape competent to stand trial. The February 16, 2007 Report indicates that the Bureau of Prisons' statistical evidence shows an approximately 70% success rate in restoring involuntarily medicated defendants to competency. Dr. Sarrazin emphasized that antipsychotic medications are the undisputed treatment of choice for patients suffering from Mr. Grape's mental illness. While he could not know for certain how Mr. Grape would respond to medication, he explained that he expected medication to improve Mr. Grape's thought processes and lessen his symptoms, which would improve the likelihood that he would be restored to competency.

Dr. Sarrazin testified in some detail about the expected medication plan he would implement should the present motion be granted. Initially, Dr. Sarrazin would begin with the second generation medications, indicating that risperdal would be his first choice if Mr. Grape agreed to take it and he tolerated it well. As noted, there is some indication in Mr. Grape's records that he has taken risperdal in the past and there is no information indicating that he suffered adverse effects. Crucial to using second generation medications is Mr. Grape's voluntary agreement to take the medication.

Alternate second generation medications that Dr. Sarrazin might use would be abilify or geodon. Again, depending on how Mr. Grape tolerates either of these medications, Dr. Sarrazin stated that with abilify and geodon extra pyramidal side effects are less than with risperdal. With any of these medications he would start with a low dose, monitoring Mr. Grape's reaction, and increase the dosage over a period of eight to ten weeks to reach a therapeutic dose. Overall, he

20

anticipates a treatment time between four to six months before he could properly evaluate
Mr. Grape's competency.

In the event that Mr. Grape refuses to take the above second generation medications, then
involuntary injections would have to be administered. In this event, Dr. Sarrazin explained that
he would have to move to a first generation injectable medication. He explained that there is no
long-acting second generation injectable medication. The only injectable second generation
medication is a short-acting form of geodon. Using only a short-acting injectable medication is
not feasible over a long period of time because of the amount of injections required. The
preferred injectable form is the first generation medication haloperidol, which comes in both
short- and long-acting forms.

Dr. Sarrazin explained that his treatment plan is to first request that Mr. Grape take
haloperidol orally. If he refused, then a short-acting injection of haloperidol would be
administered. The next day, Dr. Sarrazin would again see if Mr. Grape would voluntarily take
the oral medication. If he would not, then another short-acting injection of haloperidol would be
administered. On the third day, Dr. Sarrazin would offer Mr. Grape the opportunity to take the
medication orally one last time. If he refused, a final short-acting injection of haloperidol would
be administered. After that, Dr. Sarrazin stated that he would then wait another week to begin
administering a long-acting injection of haloperidol.

Dr. Sarrazin explained that as a patient begins to take the antipsychotic drug he may
experience enough of a relief from his symptoms to appreciate the benefit of taking the
medication and thus often become more agreeable to taking later doses orally. In other words,
the early injections may restore a person to a point where they voluntarily agree to take the same

21

medication orally.  In addition, Dr. Sarrazin explained that he would start with short-acting forms in order to be able to monitor any therapeutic or side effects from the medication.  If troublesome side effects do appear, then the medical staff is able to cease the medication immediately.  Once it is clear that a patient can tolerate the medication, a long-acting form reduces the number of forced injections.

Dr. Sarrazin explained the procedure to administer an injection as follows.  In addition to correctional staff being present, nursing staff to actually administer the injection would also be present.  Mr. Grape would be asked to place his arm through the food slot opening  in his cell door and submit to hand restraints.  If he agreed, he would be restrained, the door would be opened and the injection would be administered.  The door would then be shut and the hand restraints removed.

If he refused to submit to hand restraints then physical force would be used to administer the injection.  In this case, a lieutenant would also be present along with correctional staff and nursing staff.  If necessary, a "four cell boot team" would also be present.  The team would again seek to have Mr. grape voluntarily submit to hand restraints in order to avoid a confrontation.  If he still did not comply, then the team would be given a direct order open the door, enter the cell, and secure Mr. Grape with hand and leg restraints.  Once he is restrained the nursing staff would enter the cell and administer the injection.  In addition, a medical staff representative, a nurses practitioner or a physician's assistant, would then enter the cell to assess Mr. Grape for any injuries.  The team would then leave the cell.  At all times the lieutenant remains in charge and as a matter of policy the procedure would be videotaped.

Defense counsel argues that neither the forensic report nor the doctors were able to offer specific evidence to show that it is substantially likely that *Mr. Grape* will be restored to competency through medication. Thus, he argues that the government relies solely on the Bureau of Prisons' 70% restoration rate to meet the "substantially likely" standard. Furthermore, defense counsel argues that it is undisputed that the government's testimony and documentary evidence show that Mr. Grape is one of the more difficult types of patients to restore to competency. Defense counsel then logically concludes that the likelihood that Mr. Grape would be restored to competency must be less than the 70% Bureau of Prisons' restoration rate

There appears to be no dispute about defense counsel's contentions. Dr. Pietz testified that Mr. Grape's condition has gotten considerably worse since he has been at Springfield, and both doctors Pietz and Sarrazin testified that his condition will continue to deteriorate without medication. Dr. Sarrazin testified that the success rate in restoring defendants to competency is lower for patients who are forcibly medicated because their mental illness is usually more severe than other patients, they lack insight into their illness, and usually do not believe they are mentally ill. In Mr. Grape's case the evidence supports that he is a patient who lacks any insight into his difficulties and refuses to believe he suffers from a mental disease. Thus, it appears that Mr. Grape would fall into a category of patients whose successful restoration to competency through involuntary medication is less than 70%.

As mentioned, defense counsel bolsters his argument by pointing out that the doctors have failed to bring forth any evidence specific to Mr. Grape to show that there is a substantial likelihood that Mr. Grape will be restored to competency. The reason for this is apparent. Mr. Grape's mental evaluation and treatment history lack concrete information that might

23

indicate what his prognosis with medication would be, one way or the other. For instance, while there is evidence that he has been medicated with risperdal, the information does not show how long he was on the medication and to what extent it was effective. Other historical information about Mr. Grape is missing due to his lack of cooperation with his evaluators, his malingering, and the fact that he has provided conflicting and false information at times. An attempt to contact Mr. Grape's mother for specific information was largely unsuccessful since his mother was only willing to offer that Mr. Grape has always suffered from mental problems. Therefore, the lack of reliance on evidence specific to Mr. Grape appears to be because there simply is very little useful reliable historical information.

Despite the lack of historical information and the fact that Mr. Grape is a "more difficult" patient to treat, both doctors believe that medication is substantially likely to restore Mr. Grape to competency. Neither of the doctors expressed an opinion indicating that they believe his likelihood of restoration to competency was much less than 70%. We are uncertain how the lack of an accurate and more complete patient history factored into the doctors' decision. It is certainly understandable that medical professionals would not want to write him off without first having the opportunity to see if antipsychotic medication can alleviate his symptoms. In this regard, the lack of historical information can be seen as the absence of evidence that would undermine the doctors' belief that Mr. Grape could be restored to competency. In particular, we do know that Mr. Grape's 10-year stay in prison has not produced evidence to show an abundance of negative factors for restoring him to competency.

The administration of medications of the type suggested by Dr. Sarrazin is the usual course of treatment for patients with psychotic disorders like Mr. Grape. From what the Court

24

understands from the doctors' testimony, the medical staff will be in a far greater position to assess Mr. Grape once they are able to evaluate his response to medication. This greater ability to evaluate him can only arise if first, Mr. Grape is medicated, and second, if he has a favorable response to the medication. If Mr. Grape is not restored to competency it appears unlikely that he would be released into society unmedicated and instead he would be civilly committed. This circumstance does diminish the government's interest in this case, but we agree with the government that it is premature to arrive at that conclusion in light of the medical expert's testimony that treatment with antipsychotic medications is an appropriate and standard course for patients such as Mr. Grape.

Because the Court is not qualified to render a medical opinion we must rely on the medical experts' opinion that there is a substantial likelihood, estimated to be somewhat less than 70%, that Mr. Grape will be restored to competency. We must trust that had Doctors Pietz and Sarrazin believed that Mr. Grape's likelihood of success was 50% or 20% or less, they would have so stated. The "credibility, knowledge, motivation and experience of the Government's witnesses are not challenged." *United States v. Thrasher*, 2007 WL 713191, *1 (W.D.Mo. 2007). We are mindful that the "question of whether the Defendant can be rendered competent cannot be answered with conviction." *United States v. Schloming*, 2006 WL 1320078, *7 (D.N.J. 2006). We thus find that the government has met its burden of showing that there is a substantial likelihood that the administration of medication will render Mr. Grape competent to stand trial.

The February 16, 2007 report indicates some of the side effects of antipsychotic medications and Dr. Sarrazin further elaborated on various side effects during his direct and cross

25

examinations. Despite the numerous possible side effects that could occur, Dr. Sarrazin testified that any side effects would not inhibit Mr. Grape's ability to be competent for trial or to interact with his attorney. Dr. Sarrazin again explained that the use of antipsychotic medication in patients like Mr. Grape is a standard treatment and that the medical staff would closely monitor Mr. Grape for the appearance of any harmful side effects, as they would for any patient who is administered similar medications. There was no evidence to suggest that Mr. Grape is especially at risk to suffer from any particular harmful side effect. We are in no position to challenge the medical experts' opinion on this question and thus find that it is substantially unlikely that side effects from medication would interfere with Mr. Grape's ability to assist counsel in conducting a trial defense.

Finally, Defense counsel also referred to evidence from Mr. Grape's evaluations that indicate that his problems may not be susceptible to treatment by medication because they are a result of his malingering or simply a conduct disorder. While there is evidence that Mr. Grape is apparently extremely difficult to interact with, exhibits antisocial behavior, and is willing to attempt manipulation to get what he wants, there is no dispute that he suffers from a psychotic disorder that is susceptible, in general, to treatment by medication.

### C. Necessity of Involuntary Medication

The third prong requires us to consider whether any alternative, less intrusive treatments are unlikely to achieve substantially the same results. There is no evidence to suggest that any alternative less intrusive means exist to achieve substantially the same results. *Sell*, 539 U.S. at 181, 123 S.Ct. at 2185. Both doctors agreed that treatment other than medication may be helpful but only if such treatment was administered after, or in conjunction with, the administration of

26

antipsychotic medication. Given Mr. Grape's unwillingness to cooperate with virtually everyone and his refusal to believe that he is suffering from any problems, an Order from this Court directing him to take his medications would be futile. If he disobeyed such an Order, which all parties expect that he would, we do not have any practical punishment option to coerce him to obey an Order, as he is already confined in a single cell in a lock down unit at a medical prison. In addition, Mr. Grape's counsel conceded that less intrusive means of treating Mr. Grape are not available. We therefore find that less intrusive means are not available to the Court. We expect that the medical staff will continue to try to persuade Mr. Grape to take his medications. As noted, Dr. Sarrazin's plan clearly contemplates as one of its goals the voluntary participation of Mr. Grape with any medication treatment.

## D. Medical Appropriateness of Treatment

Finally, we must conclude that administration of the drugs is medically appropriate, *i.e.*, in the patient's best medical interest in light of his medical condition. *Sell*, 539 U.S. at 181, 123 S.Ct. at 2185. Here again, we need not go into detail as there is no dispute that the recommended treatment is medically appropriate. Mr. Grape suffers from the psychotic disorder of paranoid schizophrenia. He is uncooperative, manipulative, delusional at times, unable to maintain thought processes, has difficulty connecting thoughts in a logical order, and displays inappropriate emotions. Both doctors noted during the hearing that Mr. Grape exhibited some of these behaviors while the hearing was in process. He will not improve and will likely worsen without treatment with medication. We therefore find that the administration of antipsychotic medication is medically appropriate and in Mr. Grape's best interest in light of his medical condition.

27

## IV. Conclusion

After careful consideration of the evidence we find that the government has met its
burden under the *Sell* analysis. We therefore conclude that treatment of John Grape by
involuntary administration of antipsychotic medication, if ultimately necessary, is authorized.
We do not make the decision to override Mr. Grape's constitutionally protected liberty interest in
remaining free from unwanted medical treatment lightly. The likelihood that Mr. Grape will be
released into society unmedicated is slim, and that does diminish the government's interest in
this case. In addition, the lack of an accurate patient history makes this case even more difficult.
However, we do not know whether information missing from Mr. Grape's records would indicate
a positive or a negative prognosis to medication treatment. While recognizing the importance of
a person's history in determining the treatment decisions a doctor makes, we must balance the
emphasis we place on the lack of information with our need to rely on the medical professionals'
opinion as expressed in this case.

Another troubling factor in Mr. Grape's case is the undisputed evidence that Mr. Grape is
one of a class of particularly difficult mentally ill patients to restore to competency. Despite this
difficulty facing the treating doctors, they both testified that they believe it is substantially likely
that Mr. Grape can be restored to competency. We found the doctors to be credible and, as
stated, we trust that had they thought the chances of restoring Mr. Grape's competency were 50%
or less, they would have said so.

Finally, we consider the serious charges alleged against Mr. Grape in the indictment.
These charges are extremely troubling in light of the fact that Mr. Grape had spent ten years in
prison as a result of a sexual assault on a minor and engaged in similar conduct upon his release.

28

Thus, the government's interest in having Mr. Grape answer the charges weighed heavily in the balance in coming to our conclusion.

We enter the following Order with the understanding that defense counsel will most likely be filing a motion to stay this Order pending an interlocutory appeal. *See Sell*, 539 U.S. at 176-177, 123 S.Ct. at 2182-2183 (involuntary medication order is an appealable "collateral order," an exception to 28 U.S.C. § 1291).

And now this __6th__ day of __Sept.__, 2007, **IT IS HEREBY ORDERED** that the government's request to involuntarily medicate the defendant to restore him to competency in order to stand trial is hereby GRANTED. The United States Medical Center for Federal Prisoners at Springfield, Missouri is directed to commence the involuntary medication of defendant in accordance with Dr. Sarrazin's medical plan and consistent with this Opinion, including first seeking to obtain Mr. Grape's voluntary participation with any treatment.

**IT IS HEREBY FURTHER ORDERED** that the time for examination shall be extended for six months pursuant to 18 U.S.C. § 4241(d)(2).

Maurice B. Cohill, Jr.

Maurice B. Cohill, Jr.
Senior United States District Judge

cc:    counsel of record (via electronic mail)

Probation, Erie

U.S. Marshal, Erie

29

Joseph T. McGuire, Esquire
U.S. Medical Center for
 Federal Prisoners
1900 West Sunshine Street
Springfield, MO 65807

J.E. Gunja, Warden
U.S. Medical Center for
 Federal Prisoners
1900 West Sunshine Street
Springfield, MO 65807