# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Criminal No. 05-33 Erie |
| | ) |
| JOHN DOUGLAS GRAPE | ) |

## OPINION ON INVOLUNTARY MEDICATION

This matter comes before the Court for consideration of the issue of whether to medicate the Defendant, John Douglas Grape, involuntarily to restore him to competency in order to stand trial.

On February 4, 2010, we determined that Mr. Grape was not competent to stand trial and ordered him to a medical facility to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the trial to proceed. Mr. Grape arrived at the United States Medical Center for Federal Prisoners at Springfield, Missouri on March 18, 2010. By letter dated March 26, 2010, the Court and counsel received a letter from the Unit Manager of the Mental Health Unit at Springfield indicating that "Mr. Grape is unwilling to take medication at this time." (March 26, 2010 Letter from Unit Manager J.M. Roberts, attached as Ex. 1 to doc. 127.)

On March 30, 2010, the government filed a "Motion for Involuntary Medication of Defendant to Restore Competency," in which the government requests that we issue an Order mandating that Mr. Grape be involuntarily medicated. On April 12, 2010, the Court and counsel received a "Brief Forensic Report" prepared by Christina A. Pietz, Ph.D. and Robert G. Sarrazin, M.D. Doctors Pietz and Sarrazin report that Mr. Grape remains mentally

incompetent and that it is substantially likely that he would be restored to competency through the administration of antipsychotic medication. The government filed a brief in support of its motion on April 20, 2010, and Defendant filed a brief in response on April 27, 2010.

## I. Background

As the parties are well aware when Mr. Grape first refused to take medication against the advice of his doctors in December 2006, we held a hearing pursuant to Sell v. United States, 539 U.S. 166 (2003) to determine whether Mr. Grape should be subjected to forcible medication to restore him to competency. Thereafter, we issued an Opinion and Order allowing the Bureau of Prisons to forcibly medicate Mr. Grape. (Opinion and Order, September 6, 2007, doc. 79.) Eventually, the United States Court of Appeals for the Third Circuit upheld our Order. United States v. Grape, 549 F.3d 591 (3d Cir. 2008).

In the interim between our Order and resolution of the appeal, however, the Bureau of Prisons determined that Mr. Grape had become a danger to himself or others, allowing forcible medication pursuant to Washington v. Harper, 494 U.S. 210, 221 (1990). When staff confronted Mr. Grape with the fact that he was going to be forcibly medicated if he did not voluntarily submit to medication Mr. Grape agreed to voluntarily take the medication. After Mr. Grape began taking the medication he eventually was restored to competency. The forensic report on Mr. Grape after he was restored to competency showed a remarkable difference in his capacity. (See Opinion on Competency, February 4, 2010, doc. 125, at 6-7, citing the April 1, 2008 Forensic Report.) Shortly after returning to the Erie County Prison, Mr. Grape stopped taking his medication and decompensated. The subsequent forensic report again demonstrated a dramatic turnaround in Mr. Grape's functioning when he is

unmedicated. (See Opinion on Competency, at 7-8, citing the August 1, 2009 Forensic Report.) As a result, we once again found that Mr. Grape was not competent, and returned him to the medical facility for a period of restoration. (Opinion on Competency, February 4, 2010, doc. 125; Order, February 4, 2010, doc. 126.)

It is no surprise that we are faced with this issue again. In our February 4, 2010 Opinion determining that Mr. Grape was not competent we addressed the fact that we would likely confront the issue of forced medication again.

> If Mr. Grape again refused to take medication, we are uncertain whether another Sell hearing would be necessary. On the one hand, we have already held a hearing and found that the government met its burden to involuntarily medicate Mr. Grape. In addition, we now know that medication is likely to restore Mr. Grape to competency. On the other hand, Dr. Pietz stated in her Forensic Report that if Mr. Grape refuses to take his medication, another Sell hearing would be necessary, suggesting that she believes that the passage of time means that a new Sell hearing would be appropriate. In addition, we now know that Mr. Grape does suffer side effects from his medication. Therefore, we would need to determine under the Sell factors if the side effects would "interfere significantly with [Mr. Grape's] ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." Sell, 539 U.S. at 181.

(Opinion on Competency, doc. 125, February 4, 2010, at 10-11.)

## II. Applicable Law

The narrow issue presented in this case is whether Mr. Grape should be involuntarily medicated "in order to render [him] competent to stand trial." Sell, 539 U.S. at 179, 123 S.Ct. at 2184. The United States Supreme Court has recognized that an individual has a constitutionally protected liberty interest in avoiding the unwanted administration of antipsychotic drugs that can only be overcome by an "essential" or "overriding" state interest.

Riggins v. Nevada, 504 U.S. 127, 134, 135, 112 S. Ct. 1810 (1992), Washington v. Harper, 494 U.S. 210, 221, 110 S.Ct. 1028 (1990).

> In Sell, the Supreme Court explicitly allowed the forcible medication of an inmate "solely for trial competence purposes" in certain 'rare' instances. 539 U.S. at 180, 123 S.Ct. 2174. The Court set a standard that the government must meet in order to overcome the inmate's liberty interest, as laid out in a four-factor test. First, 'a court must find that *important* governmental interests are at stake,' though '[s]pecial circumstances may lessen the importance of that interest.' Id. Second, 'the court must conclude that involuntary medication will *significantly further* those concomitant state interests.' Id. at 181, 123 S.Ct. 2174. This includes finding that 'administration of the drugs is substantially likely to render the defendant competent to stand trial,' and '[a]t the same time, ... that administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair.' Id. Third, 'the court must conclude that involuntary medication is *necessary* to further those interests' and that 'any alternative, less intrusive treatments are unlikely to achieve substantially the same results.' Id. Fourth, and finally, 'the court must conclude that administration of the drugs is *medically appropriate, i.e.*, in the patient's best medical interest in light of his medical condition.' Id. The Court then emphasized that the goal of this test is 'to determine whether involuntary administration of drugs is necessary significantly to further a particular governmental interest, namely, the interest in rendering the defendant *competent to stand trial.*' Id.

Grape, 549 F.3d at 599-600. The government "bears the burden of proof on factual questions by clear and convincing evidence." Id. at 598.

### III. Analysis

The following factors are no longer in dispute: (1) that important governmental interests are at stake; (2) that Mr. Grape was restored to competency through antipsychotic medication; (3) that the medication is necessary to further the government's interests as there are no alternative, less intrusive treatments that are likely to achieve substantially the same results as medication would; and (4) that the recommended treatment is medically appropriate.

4

Likewise we have identified two outstanding disputed issues: (1) whether, and to what extent, the likelihood that Mr. Grape will be civilly committed if he is not restored to competency diminishes the government's substantial interest in prosecuting this case; and (2) whether Mr. Grape's known side effects are so severe that they would interfere significantly with Mr. Grape's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair.

In our Opinion on Competency we also raised the question of whether another Sell hearing would be necessary before rendering a decision on involuntary medication. In addition, we posed the question of whether Mr. Grape's mental illness has become worse over time, or more accurately, whether the doctors believe that Mr. Grape's mental status has deteriorated below what it was at the time of the Sell hearing.

We have little input from the parties and the doctors to assist us in our analysis. They are silent as to whether a Sell hearing should be conducted, implying that no one believes that a hearing is necessary. On the issue of deterioration in mental status over time the doctors, who are the only ones qualified to offer an opinion, say nothing. The Defendant thoroughly addresses the likelihood of civil commitment, while in response the government attacks the civil commitment process as "uncertain," "murky," and unpredictable as to its length. Finally, only the Defendant addresses the issue of side effects.

In large part we must rely on the medical experts to guide us as much as possible as we consider, among other things, Mr. Grape's history, his current mental status relative to his prior mental status, the extent of any side effects he would suffer from medication, and the likelihood of future civil commitment. At this point there is little new information offered by

the doctors. This is not to criticize the doctors. We are aware that the long and short of their position is that antipsychotic medication is the treatment of choice for someone in Mr. Grape's condition. We are also aware that the doctors did not observe the side effects Mr. Grape experienced while on the medication as he had ceased taking his medication long before he arrived back at Springfield. We agree that the best course for a person suffering from a mental disease is to listen to the advice of the doctor and take the medication.

Our responsibility, however, involves more than just the medical issues as we must determine if we should override Mr. Grape's constitutionally protected Fifth and Fourteenth Amendment liberty interest in remaining free from unwanted medical treatment and forcefully medicate him against his will in order to stand trial. The Brief Forensic Report by Doctors Pietz and Sarrazin contemporaneously affirms medical information about Mr. Grape that is already known. The doctors do not even expressly indicate that Mr. Grape is currently refusing to take medication. Instead the Report contains the following generic statement: "While any rational basis for treatment refusal should be addressed, it must be recognized that treatment refusal of mentally ill defendants found incompetent to stand trial often stems from deficits induced by the illness itself and transient incompetence to make treatment decisions is exceedingly common in such populations." (Brief Forensic Report, April 12, 2010, at 1.) This exact statement appears in the doctors' February 15, 2007 Forensic Report prepared prior to our Sell hearing. (Forensic Report, February 15, 2007, at 1.) That is to say, there is nothing in the Brief Forensic Report that educates us at all as to the significance, if any, of the intervening events between the Sell hearing in June 2007 and today. There is no mention of the August 31, 2009 Forensic Report that appeared to show that Mr. Grape's mental status had

significantly deteriorated and no mention of the side effects that Mr. Grape actually experienced when he was medicated.

The government, acknowledging that the circumstances of the case have changed, argues that the "case for involuntarily medicating Grape is stronger now than it was when the Court issued its previous order." (Government's Brief in Support, at 4.) In our Sell Opinion we characterized the issue of "whether medication is substantially likely to restore Mr. Grape's competency" as " the central question in this case." (Opinion, doc. 79, at 19.) This is no longer in question as we now know that medication did restore Mr. Grape's competency. This changed circumstance does indeed make the case for involuntarily medicating Mr. Grape stronger. However, the case for involuntarily medicating Mr. Grape is weakened by the likelihood of civil commitment and the fact that Mr. Grape does suffer side effects from the medication. As discussed below, we now find that the likelihood of civil commitment outweighs the government's interest in this case.

### A. Likelihood of Civil Commitment

The government does not fully address the likelihood of civil commitment in its brief. Specifically, the government does not refer to the lengthy medical history of Mr. Grape, nor does it refer to the August 31, 2009 Forensic Report detailing Mr. Grape's history and deterioration after he ceased taking medication that presented strong evidence that Mr. Grape's mental diagnosis and pedophilia will cause him to be civilly committed in the event that he is not forcefully medicated.

The government's argument against the likelihood of civil commitment is "generic" in the sense that it could be used to argue against any defendant who refuses to take medication and is facing involuntary medication. The government first argues that "there is a great deal of uncertainty concerning the likelihood of Grape's civil commitment." (Brief in Support, at 5.) In addition, the government cites to the "murkiness of civil commitment" explaining that "[n]o one really knows what will happen to Grape in the civil commitment realm and it is unlikely that defense counsel will agree that Grape should be civilly committed indefinitely or at all." Id. The government's argument does not really address the central issue of whether the likelihood of civil commitment diminishes the government's interest. Sell, 539 U.S. at 180, 123 S.Ct. at 2184. At best, the government's assertions that civil commitment is "uncertain" and that "no one really knows what will happen" are little more than a rephrasing of the issue without any supporting evidence or argument. The government does not explain how civil commitment is "uncertain." In addition, the government does not address the fact that in our Sell Opinion we found that there was no serious dispute that the likelihood of Mr. Grape reentering society unmedicated is extremely low, that the Third Circuit agreed with this finding, and that the medical evidence since that time appears to more strongly support a conclusion that it is substantially likely that Mr. Grape will be civilly committed. Finally, we discount the government's assertion regarding whether defense counsel will agree that Mr. Grape should be civilly committed since the ultimate decision as to civil commitment is made by a Judicial Officer under both federal and Pennsylvania state law.

This leaves us with the government's argument relying on the Third Circuit Court's holding on appeal of the involuntary medication order that "possible, even likely, civil commitment does not outweigh the government's interest in prosecution." (Brief in Support, at 5, citing Grape, 549 F.3d at 603.) This is an incomplete reading of the Third Circuit's opinion in light of the history of Mr. Grape's case.

The first time we addressed this issue the facts of Mr. Grape's individual case were that he was unmedicated and incompetent. At that time we stated as follows:

> Even though a section 4246 hearing has not been held, we note that there is no serious dispute that the likelihood of Mr. Grape reentering society unmedicated is extremely low. Indeed, there is no other reading of the Medical Center's Harper hearing conclusion other than, but for his confinement, Mr. Grape would be a danger. Thus, the likelihood of civil commitment here does diminish the government's interest in this case.

(Opinion, doc. 79, at 18.) On appeal, as the government points out, the Third Circuit Court held that the circumstances of Mr. Grape's likely civil commitment did not outweigh the government's important interests in prosecuting him. Grape, 549 F.3d at 603. However, when the Third Circuit Court issued its holding on this issue it acknowledged that Mr. Grape presented to them in a "restored mental state" after having been forcefully medicated under Harper while the appeal was pending. Id. at 600. The Court also stated that the "fact that Grape has already been involuntarily medicated and has been restored to competency diminishes his countervailing interest." Id. at 603. The Court acknowledged that Mr. Grape may return to his previous incompetent state, but that the Court could not be certain of "the likelihood or timeline under which he would again become incompetent." Id.

9

Prior to arriving at its holding, the Court first considered whether Mr. Grape would be civilly committed presuming that he "would mentally deteriorate [from his current competent state] if not medicated." Id. at 600. The Court first reviewed both federal and Pennsylvania state law governing civil commitment for handling incompetent inmates. Id. at 601. The Pennsylvania rule concerns mentally ill inmates who pose a clear and present danger of harm to others. Id. Such a "danger" can be shown "by establishing that the conduct charged in the criminal proceeding did occur, and that there is a reasonable probability that such conduct will be repeated," or by "proof that the person has made threats of harm and has committed acts in furtherance of the threat to commit harm." 70 Pa. Cons. Stat. § 7301. The Third Circuit Court found that Mr. Grape, prior to his forced medication, "most likely fell within the category of individuals to whom" the Pennsylvania rule would apply. Grape, 549 F.3d at 601.

The Court then noted that in our Sell Opinion we stated that "there is no serious dispute that the likelihood of Mr. Grape reentering society unmedicated is extremely low." Id. The Court continued, stating "we believe it is safe to assume that Grape would likely reenter this category if his paranoid schizophrenia returned." Id. Thus, the Court concluded that if Mr. Grape mentally deteriorated, he would likely be civilly committed under both the Pennsylvania and federal Statutes. The Court further stated that "it is not difficult to agree with the District Court's assessment that 'the likelihood of civil commitment here does diminish the government's interest in this case.'" Id. at 602.

Despite the discussion addressing what would likely occur if Mr. Grape did deteriorate, the Court was clear when it rendered its holding that it was analyzing this issue with a mentally competent defendant who may or may not become incompetent again. Id. at

603 ("due to the volatility of Grape's mental state, we cannot be certain of Grape's current mental health, or the likelihood and timeline under which he would again become incompetent.") The Court reinforced the point explicitly in a footnote

> We also recognize, however, that Grape's forced medication pursuant to Harper before our decision in this instant appeal *altered the facts of his case.* Therefore, we decline to reach whether Grape's potential for indefinite civil confinement on the facts prior to his Harper medication would have sufficed under the first Sell factor to overcome the Government's stated interests. We limit our holding here to the facts of Grape's individual case, as presented to us at the time of our decision.

Id. at 603 n. 10 (emphasis added).

To summarize, a review of the Court's entire discussion addressing the likelihood of civil commitment shows that the Third Circuit indicated that given an unmedicated and incompetent Grape, it agreed with us that "there is no serious dispute that the likelihood of Mr. Grape reentering society unmedicated is extremely low" and "the likelihood of civil commitment [] does diminish the government's interest in this case". Id. at 601, 602. The Court also corrected our statement that "but for his confinement, Mr. Grape would be a danger" to take into account that Grape was forcefully medicated at Springfield precisely because he was a danger: "we now know that, despite his confinement, Grape when not medicated already posed a danger." Id. at 601.[1] Finally, the Court explicitly declined to decide the issue of whether the "potential for indefinite civil confinement" of an unmedicated and incompetent Grape "would have sufficed under the first Sell factor to overcome the Government's stated interests." Id. at 603 n.10.

---

[1] Given that Mr. Grape has already shown himself to be a danger while confined once, we would not be surprised to learn that Mr. Grape is involuntarily medicated during his stay at Springfield while the government's motion is pending.

11

Thus, when we first analyzed the issue of potential civil confinement we did so considering an unmedicated and incompetent Grape who was not a danger while confined. The Third Circuit agreed with our conclusion but explicitly limited its holding to its consideration of a medicated and competent Grape. We now must revisit the issue of potential civil confinement of an unmedicated, incompetent, and perhaps deteriorated Grape that we now know has the potential to be a danger to others even in confinement. Neither our previous decision nor the Third Circuit's holding addressed this situation.

We now find that there is a substantial likelihood that Mr. Grape will be civilly committed if he is not medicated; indeed it is a near certainty. As before there is no serious dispute that the likelihood of Mr. Grape reentering society unmedicated is extremely low. When unmedicated Mr. Grape presents a danger to others that is mitigated solely by the fact of his confinement, but even while confined is not eliminated. Mr. Grape has already been involuntarily medicated precisely because he was a danger to others even though he was confined.

If Mr. Grape is not involuntarily medicated and not otherwise restored to competency, then he will be subject to the provisions of section 4246 of Title 18. The Third Circuit laid out the legal framework in that event as follows:

> Section 4246 provides the method for handling a defendant once he is determined incompetent. The District Court would first need to
>
>> find[ ] by clear and convincing evidence that the person is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another, [in which case] the court shall commit the person to the custody of the Attorney General. The Attorney General shall release the person to the appropriate official of the State in which the person is domiciled or was tried if such State will

12

assume responsibility for his custody, care, and treatment. The Attorney General shall make all reasonable efforts to cause such a State to assume such responsibility. If, notwithstanding such efforts, neither such State will assume such responsibility, the Attorney General shall hospitalize the person for treatment in a suitable facility, until-

(1) such a State will assume such responsibility; or
(2) the person's mental condition is such that his release, or his conditional release under a prescribed regimen of medical, psychiatric, or psychological care or treatment would not create a substantial risk of bodily injury to another person or serious damage to property of another;

whichever is earlier.

549 F.3d at 600-01, quoting 18 U.S.C. § 4246(d).

There is no doubt that Mr. Grape "is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person." If Pennsylvania does not assume responsibility for his custody, care, and treatment, then he will remain hospitalized in federal custody. He would not be eligible for release until a Court determines that he would not create a substantial risk of bodily injury to another person. We do not foresee this happening.

Mr. Grape is a pedophile, he experiences paranoid delusions, and he suffers from schizophrenia. He spent ten years in prison as a result of a sexual assault on a minor and engaged in similar conduct upon his release. The evidence also shows that Mr. Grape will only take medication that restores him to competency within the rigid confines of the Springfield Medical Center. He ceased taking his medications while confined at the Erie County Prison showing that the fact of confinement is insufficient to ensure compliance. His history shows that he only ever took restorative medications in a specialized medical facility. Thus, we cannot say that he will ever attain a mental condition such that his release or his

13

conditional release under a prescribed regimen of medical, psychiatric, or psychological care or treatment would not create a substantial risk of bodily injury to another person.

In the event that Pennsylvania did assume responsibility for Mr. Grape, the relevant Pennsylvania statute states as follows:

> Whenever a person is severely mentally ill and in need of immediate treatment, he may be made subject to involuntary emergency examination and treatment. A person is severely mentally disabled when, as a result of mental illness, his capacity to exercise self-control, judgment and discretion in the conduct of his affairs and social relations or to care for his own personal needs is so lessened that he poses a clear and present danger of harm to others or to himself.... If ... the person has been found incompetent to be tried or has been acquitted by reason of lack of criminal responsibility on charges arising from conduct involving infliction of or attempt to inflict substantial bodily harm on another, ... clear and present danger to others may be shown by establishing that the conduct charged in the criminal proceeding did occur, and that there is a reasonable probability that such conduct will be repeated. [A] clear and present danger of harm to others may be demonstrated by proof that the person has made threats of harm and has committed acts in furtherance of the threat to commit harm.

70 Pa. Cons.Stat. § 7301. Under this statute there is no doubt that Mr. Grape would be found to be a mentally ill inmate who poses a clear and present danger of harm to others. Specifically, we find that the government's evidence would establish that the conduct charged in the indictment – receiving and possessing child pornography -- did occur, and that there is a reasonable probability that such conduct will be repeated. In addition, we further find that there exists proof that Mr. Grape has made threats of harm and has committed acts in furtherance of the threat to commit harm, by virtue of his prior conviction of attempted rape of a minor. Finally, we find that his diagnosis of pedophilia, his mental illness, and his past history show a clear and present danger of harm to others.

Under either the federal or Pennsylvania framework we find that Mr. Grape will be civilly committed if a trial cannot take place. We further find that this near certainty of civil commitment significantly undermines the government's interest in prosecuting Mr. Grape. We also note that Mr. Grape has already been incarcerated for approximately 58 months; a fact that also lessens the government's interest in this case, albeit not very strongly given that Mr. Grape would likely face a very lengthy term of imprisonment upon conviction. We therefore conclude that the government is unable to establish by clear and convincing evidence an "essential" or "overriding" interest that can overcome Mr. Grape's constitutionally protected liberty interest in avoiding the unwanted administration of antipsychotic drugs. Riggins, 504 U.S. at 134, 135, Harper, 494 U.S. at 221.

Another statutory avenue for civil commitment was recently held constitutional by the United States Supreme Court, increasing the likelihood that Mr. Grape would not be released. United States v. Comstock, __ U.S. __, 2010 WL 1946729, 78 USLW 4412 (May 17, 2010). The government now has the option to seek civil commitment by certifying Mr. Grape as a sexually dangerous person pursuant to 18 U.S.C. 4248, "Civil commitment of a sexually dangerous person."

### B. Side Effects

Finally, we now know that Mr. Grape does suffer serious side effects from the medication. Before we can enter an involuntary medication order the Supreme Court directs that we "must find that administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." Sell, 539 U.S. at 181.

The government does not weigh in on this issue. Defense counsel, who has represented Mr. Grape since his initial appearance in 2005, stated at the January 20, 2010 competency hearing that Mr. Grape suffers severe side effects:

> As soon as he got back [from Springfield after he regained competence] I visited John at the [Erie County] jail. At that time I believe he had – I don't believe he was receiving the medication at that time, but he was, as a side effect of the medication, was suffering what I would describe to the Court as severe tardive dyskinesia, involuntary muscle movements, that are sometimes – it's a central side effect of the psychotropic medication, just involuntary jerks, muscle contractions, and that he was – it looked like he was getting shocked every few seconds, just twitching, and having the reaction that I would describe as you've seen somebody get shocked the way they jump or twitch. It was very severe.

(Transcript of Competency Hearing, January 19, 2010, at 8.)

When we first analyzed the issue we relied completely on the doctors' opinion that any side effects would not inhibit Mr. Grape's ability to be competent for trial or to interact with his attorney, stating that "we are in no position to challenge the medical experts' opinion on this question." (Opinion, doc. 79, at 26.) The Third Circuit Court limited its decision on this issue to the facts before it stating that "although we find that Grape did suffer side effects while taking antipsychotic medications, we have limited information on the exact side effects and severity." Grape, 549 F.3d at 605. The Court relied on our post-appeal finding that once Grape was medicated pursuant to Harper he was competent to proceed to trial, and also on the parties' representations at oral argument that the side effects were minimal. Id.

We now know that Mr. Grape suffers more than minimal side effects as reported by his counsel, but we too have limited information, and no medical opinion, on the side effects he suffered. Although the information we have concerning Mr. Grape's side effects is not complete, it is concrete information that he does in fact suffer serious side effects. Based on

16

this information it is reasonable to conclude that the side effects would likely interfere with Mr. Grape's ability to assist his counsel. However, without more information we cannot come to a definite conclusion as to whether the side effects are such that they outweigh the government's interest in overriding Mr. Grape's interest in unwanted medication. Therefore, we cannot find, as Sell requires, "that administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." Sell, 539 U.S. at 181.

### IV. Conclusion

In accordance with the above, we find that the government has not met its burden of establishing all of the requisite Sell factors by clear and convincing evidence, and therefore is unable to override Mr. Grape's liberty interest in refusing medical treatment. Accordingly, the government's motion to involuntarily medicate Mr. Grape will be denied.

Mr. Grape remains under our Order committing him to the Springfield Medical Facility for a period of restoration.[2] We expect that the medical staff at Springfield will continue to attempt to restore Mr. Grape to competency pursuant to our Order of February 4, 2010 (doc 126). We remain hopeful that Mr. Grape will regain competency during this time.

### ORDER

AND NOW, this __27th__ day of May 2010, it is hereby Ordered that the government's Motion for Involuntary Medication of Defendant to Restore Competency (Doc. 127) be and hereby is DENIED.

---

[2] At this time, Mr. Grape's initial period of restoration is set to expire on July 16, 2010. (March 26, 2010 Letter from Unit Manager J.M. Roberts, attached as Ex. 1 to Doc. 127.)

The Court has been informed by the medical staff at Springfield that Mr. Grape's "final staffing date" for his period of restoration is July 16, 2010. Therefore, IT IS FURTHER ORDERED that any delay, but to no later than July 16, 2010, resulting from the Court's determination that defendant is mentally incompetent to stand trial shall be excluded under 18 U.S.C. Section 3161(h)(4).

*Maurice B. Cohill, Jr.*
Maurice B. Cohill, Jr.
Senior United States District Court Judge

cc: counsel of record

    Marty C. Anderson, Warden
    MCFP SPRINGFIELD
    U.S. Medical Center for
     Federal Prisoners
    P.O. BOX 4000
    Springfield, MO 65801